Andrew F. Kim (SBN 156533)
akim@afklaw.com
Law Office of Andrew F. Kim, Esq. P.C.
9018 Balboa Boulevard, Suite 552
Northridge, CA 91325
Telephone: (818) 216-5288

Henry S. David (SBN 89297)
hdavid@davidfirm.com
THE DAVID FIRM®
617 W. 7th St., Suite 702
Los Angeles, CA 90017
Telephone: 213.550.4020
Facsimile:  213.550.4010

Attorneys for Plaintiff
HOWARD L. ABSELET

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HOWARD L. ABSELET, an individual and derivatively on behalf of ROOSEVELT LOFTS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LEVENE NEALE BENDER YOO & BRILL, LLP, a California limited liability partnership; et al., <br><br> Defendants. <br><br> And <br><br> ROOSEVELT LOFTS, INC. a California corporation, <br><br> Nominal defendant. | Case No. 2:16-CV-06263 JFW (JEMx) <br><br> **JUDGMENT DEBTOR EXAMINATION TESTIMONY OF JULIET OH CITED BY PLAINTIFF HOWARD L. ABSELET IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY LEVENE NEALE BENDER YOO & BRILL, LLP** <br><br> Hearing Date:  July 10, 2017 <br> Time: 1:30 p.m. <br> Place: Courtroom 16 <br><br> Action Filed:  August 22, 2016 <br> Trial Date:  December 12, 2017 |

1    Plaintiff Howard L. Abselet ("Plaintiff") respectfully submits, pursuant to

2 Section 4(b) of the Court's Scheduling and Case Management Order (Dkt. 102) a list

3 of the questions, objections and answers of Juliet Oh at her Judgment Debtor

4 Examination, June 10, 2013, in the matter *Abselet v. Alliance Lending Group, et al.*,

5 USDC Case No. 2:16 CV 00815 JFW (JEMx).

6                                   *        *        *

7 BY MR. NEUBAUER:

8 Q.  All right. Now you're familiar with the Roosevelt Lofts, LLC?

9 A.  I am.

10 Q.  And you're counsel for that entity as a debtor; correct?

11 A.  Correct.

12 Q.  It has a final plan of reorganization approved; correct?

13 A.  It had a plan of reorganization confirmed by the bankruptcy court.

14 Q.  And you're familiar with Roosevelt Lofts, Inc.?

15 A.  Yes.

16 Q.  That's the managing member of Roosevelt Lofts, LLC; correct?

17 A.  I don't know if it's the managing member. It is from my perspective the equity

18 holder in Roosevelt Lofts, LLC.

19 A.  Okay.

20 Q.  And you're not counsel now -- for purposes of shorthand, I'm going to refer to

21 Roosevelt Lofts as Roosevelt Lofts, LLC, and RLI as Roosevelt Lofts, Incorporated?

22 A.  Or debtor and RLI.

23 Q.  You're not counsel for RLI?

24 A.  No.

25 Q.  Well.

26 A.  No. I am not counsel for RLI.

27 Judgment Debtor Examination of Juliet Oh, June 10, 2013, *Abselet v. Alliance*

28

Juliet Oh Testimony

1 | *Lending Group, et al.*, USDC Case No. 2:16 CV 00815 JFW (JEMx), pp. 8:20-9:22.

2 |                  *      *      *

3 | Q.  Does RLI own a hundred percent of equity in the debtor?

4 | A.  My understanding is yes.

5 | *Id.*, pp. 10:10-12.

6 |                  *      *      *

7 | Q.  All right. Are you an attorney for Aaron Yashouafar?

8 | A.  No.

9 | Q.  Are you an attorney for Simon Barlava?

10 | A.  No.

11 | *Id.*, pp. 10:19-25.

12 |                  *      *      *

13 | Q.  Okay. Other than the mechanics' lien claims, have all other claims in the

14 | bankruptcy been resolved?

15 | A.  No.

16 | Q.  What claims are outstanding?

17 | A.  There's one mechanic's lien claim that has not been resolved. That is Integrity

18 | Builders West.

19 | *Id.*, pp. 12:1-7.

20 |                  *      *      *

21 | Q.  The plan has been approved by the Court; correct?

22 | A.  It's been confirmed by the Court.

23 | *Id.*, pp. 12:15-17.

24 |                  *      *      *

25 | Q.  The answer is yes. But the class action reserve is within your law firm's

26 | possession, custody, and control; correct?

27 | A.  Correct.

28 |

Juliet Oh Testimony

1  *Id*., pp. 15:17-19.

2                              *     *     *

3  Q.  That is a true and correct copy of a letter you wrote to me on February 7, 2012;

4  correct?

5  A.  Yes.

6  Q.  Why did you write this letter?

7  A.  I don't recall.

8  Q.  Did anyone ask you to write this letter? Take whatever time if you need to review

9  it.

10  A.  I don't recall, but I believe it's after I either corresponded or spoke with you.

11  Q.  All right. Do you recall what you said to me when we spoke or corresponded?

12  A.  No

13  Q.  All right. Now, going through, you said "This office represents Roosevelt Lofts,

14  LLC." That was a true statement when you wrote it; correct?

15  A.  Correct.

16  Q.  And looking at the first -- the second bullet, do you see where it says "In

17  accordance with the terms of the plan upon the effective date of the plan, a class

18  action reserve was established and funded. In accordance with the terms of the plan,

19  the class action reserve is being maintained by our law firm and the funds held for the

20  class action reserve are being maintained in a noninterest bearing segregated accounts

21  so as not to be commingled with any other funds." Is that a true statement?

22  A.  Correct.

23  Q.  And is that still a true statement as we sit here today.

24  A.  Yes.

25  Q.  Now, turning to the next page, you write in the last phrase, "As of the date of this

26  letter, that's February 7, 2012, the amount being held in the class action reserve is

27  $11,974,837.48." That was a true statement when you wrote it; correct?

28

1    A.  Yes

2    Q.  Then the last bullet you write once all of the Class 2 mechanics' lien claims have

3    been resolved and paid (either per settlement terms or final adjudication) any cash

4    remaining in the class action reserve will be distributed to Roosevelt Lofts, Inc., the

5    managing member of the debtor.  Was that a true statement when you wrote that?

6    A.  It says will be disbursed but yes.

7    Q.  Is that a true statement as we sit here today?

8    A.  No.

9    *Id.*, pp. 16:3- 17:25

10                              *        *        *

11   Q.  Now, I notice in your letter to me – that's the February 7th letter – you copy

12   Massoud Aaron Yashouafar.  Do you see that?

13   A.  Yes.

14   Q.  Why did you copy?

15   A.  He was the person that we contacted for matters relating to the debtor.

16   *Id.*, pp. 18:24-19:5.

17                              *        *        *

18   Q.  Yes. Do you recognize this document?

19   A.  Yes.

20   Q.  And you received this from me, both by e-mail on April 6th and by Federal

21   Express the following day, April 7th; correct?

22   A.  Yes.

23   Q.  And you understood, when you received this, that attached to this letter was an

24   irrevocable escrow instruction assigning 46.73 percent of any funds due RLI; correct?

25   A.  Yes. The escrow instructions were attached.

26   Q.  Now, turning to page 2 of that April 6th letter, it says "Please provide a current

27   accounting of what's in the class action reserve and keep us apprised of any

28

1  distribution and/or settlement claims." Do you see that instruction?

2  A.  I do.

3  *Id.*, pp. 20:22-21:13.

4                                    *       *       *

5  Q.  And you understand that you and your law firm hold the class action reserve in

6  trust under the terms of the plan; correct?

7  MS. YOUNG:  I'm going to object to the extent it calls for a legal conclusion.

8  THE WITNESS:  I don't know if we're holding the money in trust, but we were

9  holding the monies and had strict instructions for its distribution pursuant to the plan.

10  *Id.*, pp. 21:22- 22:5

11                                   *       *       *

12  Q.  Now, you notice on the second page of that April 6th letter I ask you to provide a

13  current accounting of what was in the class action reserve and keep us apprised of

14  any distributions and/or settlement of claims. Do you see that language?

15  A.  I see it.

16  Q.  Did you ever do that?

17  A.  I believe we did. But I don't think I remember seeing this language before. I must

18  have not gone to the second part of the letter.

19  Q.  You agree you received this letter?

20  A.  I did.

21  Q.  And this language was in the letter you received; correct?

22  A.  It is.

23  *Id.*, pp. 23:11-25.

24                                   *       *       *

25  Q.  Now, when you provided those post confirmation status reports, did you ever

26  identify that in July 9th, 2012, you distributed $2 million out of the class action reserve

27  to Capmark Mortgage?

28

1  A.  No.

2  *Id*., pp. 24:15-19.

3                              *        *        *

4  Q.  Do you see those lists of percipients in that schedule?

5  A.  Yes.

6  Q.  Those are never identified in any of the status reports your firm filed in the

7  bankruptcy court; correct?

8  A.  No.

9  Q.  In fact, they are not in any status report with the bankruptcy court, are they?

10  A.  It looks like there's at least one status report that I didn't see before. So any status

11  report that I saw, no they are not identified.

12  *Id*., pp. 25:2-13.

13                              *        *        *

14  Q.  Do you recognize this –

15  A.  I do.

16  Q.  – email?  And you sent it to me on November 11; correct?

17  A.  November 1st.

18  Q.  I'm sorry. November 1st. Then if you turn to the next exhibit to Tab 1, the next

19  day you wrote we have not been authorized to make any distributions on account of

20  the Yashouafars' interest; so please disregard my e-mail below. Do you see that?

21  A.  Yes

22  *Id*., pp. 25:22-26:7

23                              *        *        *

24  Q.  Now, when you wrote me these e-mails on November 1st and 2nd, there were

25  other distributions made around the time out of the class action reserve; correct?

26  A.  I don't recall.

27  Q.  Turn back to the schedule that you have before you.  That's in my affidavit on

28

1   page 3 Tab 1 of Binder 1.  Are you familiar with an entity called Capmark Mortgage?

2   A.  Yes.

3   Q.  What is Capmark Mortgage?

4   A.  I believe it's actually Capmark bank.

5   Q.  What is Capmark bank?

6   A.  It is a lender.

7   Q.  Lender to whom? Well, let me rephrase that. Were they a lender involved in the

8   Roosevelt Lofts project?

9   A.  No.

10  Q.  Were they a lender to any other project in which either the Barlava -- Mr. Barlava

11  or Yashouafar had an interest?

12  A.  Yes.

13  Q.  What entities did -- were they a lender to?

14  A.  They were the lender to entities that owned a property in Oklahoma City.

15  *Id.*, pp. 29:2-30:1

16                            *      *      *

17  Q.  And what is -- are you familiar with an entity called Carla Ridge?

18  A.  Yes.

19  Q.  What is Carla Ridge?

20  A.  I believe it is an affiliate of Simon Barlava.

21  Q.  What do you mean by an "affiliate"?

22  A.  I don't know the exact relationship between Mr. Barlava and Carla Ridge, but that

23  is the entity that I've also associated with Mr. Barlava.

24  *Id.*, pp. 30:21-31:5.

25                            *      *      *

26  Q.  Who told you or your firm to make a distribution of 1 million to Capmark

27  Mortgage?

28

1   A.  The debtor.

2   Q.  All right.  Who in the debtor?

3   A.  I don't recall that instance. Generally I would receive instructions from Mr.

4   Barlava -- Simon Barlava and Aaron Yashouafar on behalf of the debtor.

5   Q.  Both of them or one of the other?

6   A.  It might start with one or the other but ultimately both.

7   Q.  So, in other words, both had to concur in any distribution?

8   A.  I generally made it my practice to get concurrence from both.

9   *Id.*, pp. 31:14-32:2.

10                          *       *       *

11   Q.  Are you familiar with an entity called Berkadia Commercial Mortgage?

12   A.  I am.

13   Q.  What is Berkadia Commercial Mortgage?

14   A.  I believe it is the servicing agent for Capmark.

15   *Id.*, pp. 34:1-6.

16                          *       *       *

17   Q.  All right. What about the Capmark on July 9th, 2012, for $2 million?

18   A.  That was made.

19   *Id.*, pp. 34:11-13.

20                          *       *       *

21   Q.  Do you know if, by the way, Mr. Barlava had any interest in the property in

22   Oklahoma?

23   A.  Yes.

24   *Id.*, pp. 35:3-5.

25                          *       *       *

26   Q.  Now, the million on September 11, 2012 -- was that paid to Carla Ridge from the

27   class action reserve?

28

1  A.  Yes.

2  Q.  All right. And midland loan servicing 195,000 -- was that paid to midland loan

3  servicing from the class action reserve on November 15, 2012?

4  A.  Yes.

5  Q.  For what purpose?

6  A.  That was a payment we were directed to pay on account of RLI's interest.

7  Q.  All right.  And what is midland loan servicing?  What interest did they have in

8  RLI?

9  A.  I don't know.

10  *Id.*, pp. 35:13-36:1.

11                            *      *      *

12  Q.  Now I'd like you to turn to Tab 5 in binder 1. By the way, before -- just so I'm

13  clear. In summary of that schedule, it's your testimony that -- which of the

14  distributions, to your knowledge, have not been made that are set forth?

15  A.  The March 20th, 2012, payment of 30,000 to Desert Field. I didn't see that in our

16  records. And the July 19, 2012, payment to Berkadia of 930,000. I did not see that in

17  my records.

18  Q.  All the other payments have been made; correct?

19  A.  They were made from the class action reserve accounts, yes.

20  Q.  And no payment has been made to Mr. Abselet; correct?

21  A.  Correct.

22  *Id.*, pp. 36:8-23.

23                            *      *      *

24  Q.  Have you made any distribution to RLI from the class action reserve, not on

25  behalf but directly to RLI?

26  A.  No.

27  *Id.*, pp. 40:6-9.

28

Juliet Oh Testimony

1  Q.  So of the $5 million that's -- well, of the approximate $5 million that's been

2  released from the class action reserve since you received the notice of assignment in

3  April 2012, not a single dollar has gone to RLI; correct?

4  A.  I'm going to take your word for it on 5 million, but no payments have been made

5  directly to RLI.

6  Q.  But they've made payments to people on behalf of RLI; correct?

7  A.  Yes.

8  *Id*., pp. 40:12-22.

9                          *        *        *

10  Q.  Did you discuss this assignment with Mr. Yashouafar at the time you received it?

11  A.  I communicated those instructions to the debtor. And if you're talking about

12  individual people Aaron Yashouafar and Simon Barlava.

13  *Id*., pp. 52:9-13.

14                          *        *        *

15  Q.  All right. What transfers did you discuss -- in other words, which of the transfers

16  occasioned you to talk to either Mr. Barlava or Mr. Yashouafar regarding Mr.

17  Abselet?

18  A.  I don't recall.  Definitely came up in connection with other distributions, but I

19  don't know which distributions, and I don't know when.

20  *Id*., pp. 53:16-22.

21                          *        *        *

22  Q.  Turning to Tab 15, you'll see -- page 11.  Now, this is a transfer to Berkadia

23  commercial mortgage?

24  A.  Yes.

25  Q.  And my recollection is this relates to the Oklahoma property?

26  A.  Yes.

27  Q.  What was that for?

28

1   A.  I don't know, but it was a payment to the lender on the Oklahoma City property.

2   Q.  But this was for the benefit of RLI; correct?

3   A.  Yes.

4   *Id.*, pp. 56:19-57:6.

5                                    *         *         *

6   Q.  Let's turn to the next page. That's the same $963,000. That's for Berkadia

7   mortgage?

8   A.  Yes.

9   Q.  That is the loan number that pertains to the loan on the Oklahoma property;

10  correct?

11  A.  I believe so.

12  *Id.*, pp. 58:14-19.

13                                   *         *         *

14  Q.  All right. Now you say the last sentence this wire transfer must be initiated today

15  so that Capmark bank receives the funds tomorrow.

16  A.  Yes.

17  Q.  Why was that important?

18  A.  I don't recall exactly, but I'm sure because there was a deadline.

19  Q.  And this again relates to the Oklahoma property; correct?

20  A.  Yes.

21  *Id.*, pp. 59:10-19.

22                                   *         *         *

23  Q.  So we're clear on July 9th, 2012, $1,037,000 was wired to Berkadia mortgage?

24  A.  Sorry. I was on February 27th. So you're talking about a July 9th. So on July 9,

25  2012, there was two wire transfers totaling 2 million that was made to Capmark.

26  Q.  That was for the Oklahoma property; right?

27  A.  Yes.

28

1  *Id.*, pp. 60:5-12.

2                                    *       *       *

3  Q.  Is there any other lien claimant or person having a security interest against that

4  account?

5  A.  No. Other Than Integrity Builders West, no.

6  Q.  And you are aware of the assignment by the Yashouafars of their 46 percent

7  interest of any monies owed to RLI; correct?

8  MS. YOUNG: To Mr. Abselet.

9  THE WITNESS: An assignment.

10  BY MR. NEUBAUER:

11  Q.  An irrevocable assignment of any monies.

12  A.  I've seen the escrow instructions.

13  *Id.*, pp. 68:13-23.

14                                   *       *       *

15  Q.  And you're also aware that there's judgment in favor of Mr. Abselet against the

16  Yashouafars; correct?

17  A.  Yes.

18  Q.  And you're also aware that judgment has been perfected including with the filing

19  of UCC 1 lead with California Secretary of State; correct?

20  MS. YOUNG: Are there documents which reflect that?

21  THE WITNESS: I have no reason to believe otherwise.

22  *Id.*, pp. 69:4-14.

23                                   *       *       *

24  Q.  Just to clarify you're aware that UCC 1 filing has been made with the California

25  Secretary of State?

26  A.  I see the financing statements. I don't see that it's a recorded copy but --

27  Q.  You have no reason to dispute that?

28

Juliet Oh Testimony

A.  No.

*Id.*, pp. 69:20-70:1.


DATED:  June 28, 2016      LAW OFFICE OF ANDREW F. KIM, ESQ. P.C.


By: _/s/ *Andrew F. Kim*
Andrew F. Kim
Attorney for Plaintiff
HOWARD L. ABSELET